Next case on this afternoon's docket is the case of Bituminous Casualty Corp. v. Dutch Creek Co. Ronald J. Aldrich II v. Bituminous Casualty Corp. v. Glenmore Isles v. Candace Isles v. Bituminous Casualty Corp. We have just two parties that, two attorneys that are arguing, is that correct? I rise on Roe V. Waltz v. Constance. Okay, and Mr. Sloss? Yes, I am the attorney on behalf of all the attorneys who responded to the press here. Aldrich, I am the attorney on behalf of all the attorneys. Okay, you may proceed then Mr. Roe V. Waltz. Thank you. Again, good afternoon, Your Honor. Good afternoon. I'm the court counsel. For the record, my name is John Lorval, and I represent Bituminous Casualty Corporation. With me today at counsel's table from Bituminous headquarters in Rock Island, Illinois, is Mr. Gary Hogan. And at this time, Your Honors, I'd like to request five minutes for rebuttal. Certainly. Thank you. The Fourth Court today is the appeal of a lower court's order that is literally unprecedented. The order is unprecedented not only in Illinois, but it is unprecedented in any court in any state across the country. The lower court's opinion literally stands alone in the United States case. No court decision has been cited from any jurisdiction which supports the lower court's decision. And in fact, numerous cases have been cited which reject the conclusion reached by the trial court in this case. On de novo review in this court, the lower court's order should be reversed so as to bring this case back in line with case law in Illinois and across the country. What we have this afternoon- You're saying that there's an Illinois case that addresses the exact same argument? Not the exact same argument, but- And are there cases from other jurisdictions that address the exact same issue? Not the exact same argument- Just wanted to make sure. But they do touch upon the same issues, namely whether the each occurrence limit or the general aggregate limit applies to what all parties agree is a one occurrence case. And what we have today, as your Honor noted, is an insurance coverage case. This case came about after an explosion at an oil and gas well, which caused serious bodily injury and property damage claims and gave rise to several underlying losses. Recognizing that this explosion was one occurrence, bituminous stepped up and agreed to pay its full one occurrence policy limits into the court via an interpleader action. Basically giving the money to the court so that the court could divide up among the numerous claims who should get what because there simply wasn't enough money to go around. The plaintiffs in the underlying cases were not satisfied with the tender of the each occurrence limit. The plaintiffs wanted more. They want the different general aggregate limits of the policies, frankly because the general aggregate limits are higher than the each occurrence limits. They want the general aggregate limits even though everyone agrees that the injuries and the damages at issue were caused by a single one occurrence, the explosion. The lower court issued an order incorrectly stating that the general aggregate limit of the policies apply even though it's to acknowledge that there is only one occurrence at issue in this case. Simply stating the lower court's opinion is wrong. Under the policy language at issue, it is the each occurrence limit, not the general aggregate limit, which applies to all claims that arise out of one occurrence. Therefore, the lower court's order should be reversed by this court. There are two different insurance policies at issue in this case. The Bulldog Bell policy and the Dutch Creek policy. There are three different areas of the policies that are critical to understand this case. The first area is the declarations page. The second area is section one, which provides the coverages. And the third area is section three, which sets forth the limits of insurance. The declarations page of the Dutch Creek policy states that the each occurrence limit is one million and the general aggregate is two million. And the declarations page of the Bulldog Bell policy states that the each occurrence limit is 500,000 and that the general aggregate is one million. Section two, coverages, sets forth the coverages afforded by the policies. Coverages A, B, and C. And what we're dealing with here, Your Honors, is coverage A, bodily injury and property damage. And finally, section three of the policies sets forth the limits of insurance. Paragraphs one, two, and five are at issue here. And I have for the court, if it helps the court, basically a copy of section three that I've printed out. I thought maybe if I handed that up, it might be helpful to follow along. I've given copies to both counsel. Certainly. Thank you. For the record, I'm just tendering the court something that's already cited in the record, appendix page 32. Thank you, Your Honor. Section three of the policies, Your Honor, sets forth the limits of insurance. The three paragraphs that are relevant here are one, two, and five. Paragraph one provides that the limits of insurance set forth what we will pay. And basically, it doesn't matter how many insurers there are, how many claims are made, or how many suits are brought, or how many persons are making claims or bringing suits. These rules set forth what the policy provides. Paragraph two is the general aggregate limit. The general aggregate limit is the most bituminous we'll pay for the sum of everything provided under coverage A, B, and C. Section five, or excuse me, paragraph five, is the each-occurrence limit. The each-occurrence limit is subject to paragraph two, which is the general aggregate. So subject to the general aggregate, the each-occurrence limit is the most bituminous we'll pay for the sum of damages under coverage A, which is what we're dealing with here, because of all bodily injury and property damage arising out of any one occurrence. There is no dispute in this case that this explosion was one occurrence. And that's it, Your Honors. That is the plain and unambiguous wording of the policies. And there are several cases holding that the policy language in section three is not ambiguous. Century surety versus seductions. The United States Court of Appeals for the 11th Circuit rejected the arguments that the declarations page in section three were ambiguous. And the court stated that section three's provisions are not ambiguous and entirely consistent with one another. Cincinnati Insurance Company versus TV Engineering. Two plaintiffs were in a television van, and they lifted the arm up over the television van to catch the television signal, and they ended up hitting a power line and being electrocuted. The court determined that that was one occurrence, and that, therefore, the one-occurrence limit applied. The court stated there is no conflict or ambiguity in a policy that provides a per-occurrence limit and an aggregate limit. And applying the insurance position would not only abrogate the per-occurrence limit, it would also ignore the word aggregate in the products completed operations aggregate provision. Greaves versus State Farm. The court found no ambiguity between a $1 million each occurrence limit and a $2 million general aggregate limit and stated that ambiguity can only be found, and I'm quoting here, through a series of elaborate and novel feats of syntactical acrobatics. And I will submit to the court that is what we have in this case. That exactly applies here. Where do the arguments made by my opponents and where do the arguments of the lower court go off track? The lower court's analysis goes off track and it is wrong as a matter of Illinois law because it accepts a false premise. A false premise created by, if I may borrow the phrase, novel feats of syntactical acrobatics. The false premise argued by the appellees and accepted erroneously by the trial court is that the words coverage A written in section 3 of the policy means that the policy incorporates by reference all of the words used in section 1 coverage A. The lower court said it was literally copying language from section 1 into section 3. And the lower court said that three different times in its order. That's wrong as a matter of law. The policy does not say that section 3 incorporates or interlineates or cuts and pastes and copies words from section 1 into section 3. The policy does not call for the incorporation of words from section 1 into section 3. The lower court cited no policy language for that proposition. The lower court cited no case authority for that proposition. In fact, cutting and copying section 1 into section 3 creates a complete absurdity. It would create, in effect, a never-ending policy. Section 1 coverage A is five pages long. It also has three pages of definition for a total of eight pages. The phrase coverage A appears in the policy 25 times. So if you accept the lower court's analysis and you incorporate text into each place where the phrase coverage A is used, you have just created a 200-page insurance policy. But it doesn't end there. It's, in effect, a continuous loop because the stuff you just incorporated also uses the phrase coverage A, so you have to incorporate it again. You would create a never-ending insurance policy, a continuous loop which goes on into infinity. No wonder the lower court was confused and found it ambiguous. But that's not reasonable. That's not a proper construction of a policy. In fact, that is an absurd reading of the policy. The second point of error is the lower court's notion that the general aggregate is not defined in the policy. Respectfully, Your Honor, it is. It is. The general aggregate is the most we will pay, so it is defined in the policy. But more fundamentally, as noted by the Illinois Supreme Court in the Lampen-Hickey case, the absence of a definition does not per se make a clause or a phrase ambiguous. So where does that leave us? It is not reasonable or appropriate under Illinois law to incorporate or interlineate words into Section 3 that are not there. It is also not reasonable to erase words out of the contract. But unfortunately, that is exactly what the lower court did. The lower court's order erases the each-occurrence limit completely from the policy, never again to apply in any circumstance. I challenge my opponents to cite to this court any factual scenario, any factual circumstance where the each-occurrence limit will ever apply again under the lower court's analysis. They can't do so because the lower court has erased the each-occurrence limit from the policies by virtue of the Supreme Court. The lower court has also erased the phrase, subject to, in paragraph 5 of Section 3, and the lower court has erased the language, because of all bodily injury and property damage arising out of any one occurrence. That's not a proper contract interpretation under Illinois law. And, Justice Stewart, you wrote in the Pekin case, Pekin v. Wilson, which was affirmed by the Illinois Supreme Court, quote, It is not appropriate or reasonable to read one paragraph, paragraph 2, and the second paragraph, paragraph 5, as saying exactly the same thing. And yet that is what the lower court's order says, in the appendix at page 13 of the lower court's order. It is not reasonable or appropriate to find that the general aggregate limit applies to what we all agree is one occurrence. And respectfully, Your Honors, it is not enough for the lawyers representing the claimants to say, I don't understand the language, or, gosh, when you copy all this stuff in from Section 1 into Section 3, it becomes confusing. Well, of course it becomes confusing if you copy 8 pages of text from one section and plug it into another section. But that's not how the policy is written. There is no support in Illinois law for the type of rewrite of the insurance policy that my opponents seek in this case. Now, we all agree that this dispute arises out of a single occurrence. That's not a dispute. The parties agree. The lower court agrees. I would simply state that the opposing parties have not come forward with any case anywhere in the country which applies the larger general aggregate limit to a single occurrence limit. And I am aware of no such case that has ever held that anywhere in the country other than the lower court's opinion. By contrast, we have cited numerous cases from Illinois and elsewhere where the each occurrence limit was found to apply to what was a single occurrence loss. First and foremost is the Ware case, W-A-R-E, a January 13, excuse me, January 2013 opinion out of the First District. Now, unfortunately, the lower court in our case did not have the opportunity to review and consider the Ware opinion by the Illinois Appellate Court because that opinion was issued after our appeal was started and after the trial court issued its ruling. But in any event, that case involved a three-story apartment building. And on the back of that apartment building was a wooden structure that had three decks on it for each apartment. And the folks on the second floor and the third floor decided to have a party. And the parties filled over onto the decks, and the third floor deck crashed down on top of the second floor deck and then crashed down onto the ground. Thirteen people were killed. Twenty-nine people were injured. A horrific, horrific accident. The policy in question provided a $1 million each occurrence limit, a $2 million general aggregate limit. The injured plaintiffs in that case argued that the policy was ambiguous, and they want to tap into the $2 million general aggregate limit. Now, you're right. They didn't argue the exact argument made here, but they did argue ambiguity. If there was ever a case to create ambiguity to try to maximize the recovery with 13 dead people and 29 injured people, that was the opportunity. But the Illinois appellate court said no. The Illinois appellate court held firm and determined that since all of the deaths and all of the injuries were caused by one occurrence, the each occurrence limit of $1 million was the maximum amount of coverage afforded by the policy. And here there is one occurrence, and the exact same result is warranted in this case. There are several other cases cited in our papers which hold that where there is one occurrence, the each occurrence limit applies. Travers v. R.S. U.I. Indemnity. E. coli bacteria injured several people. The policy in question provided coverage in the amount of $1 million each occurrence, $2 million general aggregate. The court found that all of the injuries were caused by one occurrence, therefore the one occurrence, each occurrence limit applied. Owners Insurance Company v. Salmon City. That was a South Carolina Supreme Court case. The insurer distributed defective stucco products all across the state. The court held that distribution amounted to one occurrence, and therefore the each occurrence limit applied to that case. R.L.I. Insurance Company v. Simon's Rock. In this case it was a shooting rampage. The shooting rampage left two dead folks and four wounded folks. The court determined that since all of the claims arose from a single occurrence, the each occurrence limit, not the general aggregate limit, applied to all claims. The opposing parties and the trial court below have not cited a single case from any jurisdiction which finds that a general aggregate limit applies to a one occurrence claim. Again, Your Honor, the main point that I'd like to drive home is simply the incorporation theory. No support in the law to incorporate policy language from Section 1, copy, paste it, and cut it into Section 3. Obviously if that's done, an ambiguity is created. I'm not aware of any authority to support that. For the reasons stated here today, for the reasons set forth in greater detail in our briefs, my two minutes respectfully request that this court reverse the lower court's September 21st order, issue an opinion stating that the each occurrence limit applies to what we all agree is a single occurrence, and remand this case for further proceedings in the circuit court on arbitrary action. If there are any questions from the court, I'd be happy to address them. Thank you, Mr. Rodewall. You'll have the opportunity for rebuttal. Thank you, Your Honor. Mr. Sloss. Thank you. May it please the court, counsel. My name, of course, is Larry Sloss, and I represent Glenn and Candace. I also, as the court was notified, ask to present the acquittees' argument for both, or for all three, Aldridge, Cunningham, and Comcast, whose attorneys are present here in the courtroom. Our clients have personal injuries and wrongful death claims that are in the underlying lawsuits pending against my two misnamed insurers, as a result of oil and unexploded fire. We have clearly admitted that it was a result of one occurrence. That is the only agreement between the parties, as there was one occurrence. By a two-miss file in our clear case, we're seeking to intercleave the policy limits under two separate and distinct policies. What we've termed as the Dutch Priest policy is a policy that provides coverage to four named insurers under that policy. The Bulldog Well Service provides coverage to two named insurers under the policy. Central to the dispute in this case is what is the limits of coverage. As by two-miss counsel points out, by two-miss claims, the each occurrence limit of the Dutch Creek policy is $1 million, and the general aggregate is $2 million. Under the Bulldog Well policy, by two-miss claims that the general aggregate, or excuse me, the each occurrence limit is a half million dollars and the concurrence limit is a million. They claim that the each occurrence limit is what should be deposited with the court. We dispute that and file counterclaims to that effect, asserting that because of certain ambiguities within the policy and the declaration page, that the coverage which provides the, because of the ambiguity, the coverage which applies, or affords the great sums to the named insurers should apply, and therefore $2 million of the Dutch Creek policy should be paid into the court, and $1 million of the Bulldog Well policy. And we do this for the reasons as I've stated as an ambiguity. The first ambiguity, which was found by the trial court, was there's an ambiguity in the manner and way in which by two-miss policies, they're identical in their language, describes when the general aggregate limit applies and when the each occurrence limit applies. As counsel points out, he asked you to look at a very specific section of the policy. It's our position that the policy has to be read as a whole, and in reading as a whole, the ambiguity is created. The second ambiguity is created in a minute endorsement to the declaration page, which changed the coverage. And as Judge Foster points out in his decision, that compounds the ambiguity because of the ambiguity that exists within the declaration page, but that only applies to the Dutch Creek policy, not the Bulldog Well policy. Judge Foster, below, found these ambiguities exist and construed the policy in favor of the insurers on those policies. Judge Foster did not find that any time there was a multiple-injury drug resulting from a single occurrence that the general aggregate applied. He specifically found that that was based on the ambiguity that exists in the policy. If you follow Judge Foster's order, though, it is true, is it not, that in any multiple-injury situation it would be the general aggregate limit? I mean, I heard your opposing counsel say, I challenge him to tell me when the each occurrence limit would apply. The situation is, Judge, we have to look at the policy before the court. The policy before the court under the ambiguity which exists in the policy, that is true. But it's not that in every situation that it would apply. It is only in the specific language of this policy. We submit to the court just the case of first impression. There's no case study where any court has construed whether there's an ambiguity between the general aggregate limit and each occurrence limit under the specific language of the Dutch Preferred Bulldog Law policy. These are standard form policies, though, aren't they? Yes, they are, Your Honor. The standard, in fact, and I can't agree with the science, but this is an insurance service office policy. The insurance service office, as the court is aware, is a trade organization. It provides service to the insurance industry. It provides not only statistical data and flex statistical data, but also provides this type of form. With regard to the forms used, they do not have the force of law, and, Your Honor, because you use an ISO form does not mean it's ambiguous. In fact, in our brief, we cite cases where ISO forms have been found to be ambiguous and further cite cases where they imply that ISO amends the form where its provisions are found to be ambiguous. The policy language which we believe are relevant and susceptible to more than one reasonable interpretation, includes Section 3, which counsel provides for the court, but also Section 1 of the policy, that being the coverage section, and particularly coverage A, bodily injury and property damage liability section, when interpreted with the definition of occurrence and the declaration page, we believe that the ambiguity is apparent. In addition to the language that counsel provided to the court, the Section 3, coverage A, which is referred to under both the general aggregate, which says that the general aggregate is the most we will pay for the sum of damages under coverage A, if the insurer reads the policy as directed by Y. Tumas in the first page of its policy, which says various provisions of this policy restrict coverage, read the entire policy carefully to determine rights, duties, and what is and what is not covered. So when the insurer reads the limits of coverage and sees that the general aggregate is the most they will pay for damages under coverage A, when you look at the insuring agreement under Section 1, it provides that we will pay those sums that the insurer becomes legally obligated to pay as damage because of bodily injury or property damage to which this insurance applies. Section B talks about when the insurance applies. It states the insurance applies for bodily injury and property damage only if the bodily injury or property damage is caused by an occurrence. It goes on to say an occurrence that takes place in the coverage territory. In the coverage territory. I didn't mean to stop. And it goes on to list additional conditions under 2 and 3 of the policy. There are under 2 and 3 of subparagraph B. But in essence. That particular phrase seems to be mainly focused on whether or not it occurred in the coverage territory. What about that? Your Honor, my reading of that section is that the bodily injury is caused by an occurrence. That takes place in the coverage territory. I agree that it has to be in the coverage territory, but it specifies that it has to be an occurrence, and an occurrence is specifically defined in the policy and in quotations. So I don't believe that that's merely an occurrence in the coverage territory. I believe that is a limitation on what is covered for bodily injury and property damage caused by an occurrence. We believe that reading the policy as a whole, and not section 3 in isolation, that the general aggregate provides that the most bytunus will pay is for bodily injury caused by an occurrence, and that it's reasonably susceptible to read that, as well as the section 3, which provides that each occurrence limit is the most it will pay for bodily injury arising out of one occurrence. We believe that an occurrence and one occurrence is the same thing, and would submit to the court that an occurrence references one occurrence, not more than one occurrence. Bytunus chose the language that it used. I don't believe there's any dispute that bytunus drafted the policy. As Judge Foster points out in the decision, bytunus could have made the general aggregate limit unambiguous simply by saying that the general aggregate limit is the most we will pay the sum of damages under coverage A arising out of more than one occurrence during the policy period. It did not do so. Your Honor, with regard to the cases cited, we would ask the court to review those cases very carefully and look at the facts of each case. Those cases I believe the court will find are not on point. Those cases are not on point and clearly are distinguishing. The Ware case, which was cited, if you look at that case, I agree that the facts were there were building collapses that fell. The issue became was there were one occurrence or multiple occurrences because some of the injuries did not manifest themselves immediately. They manifested themselves at a later time. The Ware court found that there was one occurrence, even though the injuries manifested at a later time. It did not consider whether there was an ambiguity between the general aggregate limit and each occurrence. That was an issue of the definition of an occurrence. Correct. Similarly, the other Illinois cases we're aware of are the Addison case, which discussed occurrences, and the Scottsdale v. Roperson case. Those cases are also not on point. The Addison case involved two young men who were going fishing. They were walking across an excavation pit, somehow got stuck, and were trying to get themselves out. They did not have hypothermia or grounding or combination. The issue in that case, again, was whether it was one occurrence or multiple occurrence. It didn't involve an ambiguity. The Scottsdale v. Robertson case is a situation involving an apartment building, I believe in Chicago, where there was carbon monoxide poisoning. The tenants, some of them died, some were injured because of carbon monoxide poisoning. In Scottsdale v. Robertson, they claimed that each injured party was entitled to its own occurrence limit and focused on the ambiguity within the occurrence limit and argued that the definition of bodily injury created ambiguity in that particular case because of the way it defined bodily injury. That case is actually, we feel, in support of our position because it establishes that the court must look at the entire policy, not an isolated provision of the policy, in determining whether there's an ambiguity. I believe the red herring in that case is a talk about whether a person is a qualitative or quantitative distinction, and that issue was raised in the briefs. With regard to the qualitative, if you look at the decision, it's really talking about a person, and the court held that that dealt a human being, and that was a qualitative distinction. It was completely a person. When you look to occurrence, an occurrence does not have a qualitative type. It has to be a how much. How can we have a qualitative what kind of occurrence? That, I think, is a red herring in the brief and in support of Vitimus' position. I would like to focus the remaining argument concerning the declaration page at issue, which applies only to the Dutch Creek policy. During the policy period, and this is found in appendix of Vitimus' brief on page 39, or page 78 of the calendar of records. During the policy period, the Dutch Creek policy itself was amended by an endorsement that changed the declaration page. That endorsement at the top states that this endorsement changes the policy. Please read it carefully. General liability policy changes. Then approximately a third of the way down, it has in both letters, items designated with quote X have been changed. Below that, immediately below that is marked limits of insurance. Below that has each occurrence limit of $1 million. Three boxes down under the section other, it has a type in phrase, amending GL limit to $2 million, $2 million, $1 million, $1 million. It is our position that on the face of the endorsement that changed the declaration page, that the amending of the GL limit to $2 million, $2 million, $1 million, $1 million, without specifying what that amendment, the insured reading of that policy would take that to mean amending the GL limit to $2 million, which is the occurrence limit. In fact, in this case, the GL general liability, I assume we don't really know. That's what it would appear to me. In fact, the attorneys which are retained by this case to represent the main insurance under this policy in the underlying case have also entered an appearance on behalf of the main insurance in the interpleader case and have taken this very same position. If you look at the pleading file on behalf of Dutch Creek Company, it raises an affirmative defense which sets forth the amendatory endorsement and changing the declaration page asserting that in Dutch Creek's position that the amendment amended the general liability limits to $2 million and it presents impurity on the face of the policy. In summary, we believe that the key to proper understanding of the policy is to interpret it as an entire policy, not in isolation by each paragraph. With regard to the argument that Judge Foster incorporated page after page, I think that's merely semantics. Whether you're saying referred to or in conjunction with, clearly Bifumis in its own policy says that the insured must read the entire policy. Again, what Bifumis fails to address is that the policy and declaration page has to be construed and interpreted as an ordinary, plain person would. It's insured and not as an insurance professional out of the coverage of 30 years of service. We would ask the court staff in reviewing the policy and would submit to the court that when it was looked at in total, that both the coverage limits on the general items and each occurrence are, in fact, susceptible to more than one reasonable interpretation and that the declaration page or the endorsement which changed the declaration page is also susceptible to more than one reasonable interpretation. We would ask the court to affirm the decision of the trial court finding that the liability limits under the Dutch Creek policy is $2 million and that the limits under the Goldwell policy are $1 million. And we would like to thank the court for its time and consideration of the issues. Thank you, Mr. Sloss. Mr. Rodewald, rebuttal. Thank you, Your Honor. Mr. Rodewald, before you get started, help me out here a little bit. Let's go to the last thing Mr. Sloss talked about, and that's Appendix 39, which is the endorsement making policy changes. Yes, sir, I have it. Okay, and the part you referred to where it shows other and there's an X. I'll let you get it there. Yes, sir. It says amending GL limit to GL's general liability. Right. I have to look about maybe another couple inches up. The policy check limits of insurance, commercial, general liability. It amended the each occurrence limit to $1 million and the general aggregate limit to $2 million. The policy used to have $500,000. Of course, it reverses it. It's like you're reading it from the bottom up, $2 million, $2 million, $1 million, $1 million. Bottom up, I think, is the point. But the reality is relying on amending GL limit, $2 million, $2 million, $1 million, $1 million, goes no further. It doesn't say which, really, as Mr. Schlosser argued, read the whole page. Okay, well, let me ask. The next line says increasing D limit to 1 million. What's that D? D is downhole coverage. It's covered downhole coverage. Downhole. It's coverage for tools down the level. No application here, but basically what they've done is the earlier form had a lower limit for D coverage, and now coverage D has been increased to 1 million. So, I mean, if you go back to the policy, there's no coverage D like there's a coverage A, B, C. Correct. So how is somebody supposed to know that that's what that's talking about? Well, the D limit is increased to 1 million. I mean, how are you supposed to know what the D limit is? Well, you go back and you look at the other parts of the policy that would show you what coverage D is. Is there any place else in the policy that calls it a D limit? D is downhole coverage, Your Honor, and I would imagine there's an endorsement somewhere on here. Okay, let me ask you about the next line then, delete Z and W limit. Different types of coverages. Z is, I forget what Z is, but bias and traction liability. In this case, Your Honor, we're dealing with coverage. I know we're not dealing with that, but I'm just trying to figure out how somebody is supposed to understand what we're talking about. Well, in this form, this would tell you that there's no more, as of the date of this form, which is four months into the policy, there is no more D coverage, there is no more W coverage, but, I'm sorry, Z, there is no Z, there is no W limit. Right, there's no limit. You'll pay whatever the damages are, whatever, for Z and W, whatever that is. The policy would say that coverage D, coverage Z, we will pay the limit on the policy. The policy would be zero for coverage Z. Okay. And then on the D, it's increased the limit. Increasing it to one million. Yes, sir. Okay. All right. I'm just interested in how you interpret that. I know. It's very shorthand, I'll admit. That section is shorthand for the various changes that are being made in the policy. But, again, I would submit that when you amend the GL limit, all you have to do is look up at where the commercial general liability limit is, where it says each occurrence one million, general equity two million. Mr. Sloss was very heartful in saying we read the policy as a whole, and that the copying and pasting is mere semantics, but the trial court opinion and opposing house's brief are replete with examples of where they say you have to copy the text from section one into section three. And, for example, here is a quote from Mr. Sloss' brief to the trial court. In the record 413, he wrote, when the insuring clause, that's the section one, is inserted into paragraph five of section three, the each occurrence limit provides a spot. So there's no debate that the argument was made below, and is also being made here, that you actually are copying, cutting, pasting, inserting language from section one into section three to find an ambiguity. And, again, that's simply not appropriate Illinois contract constriction. The general principles that the trial court applied, you'll agree, is well-settled Illinois law as far as if there is an ambiguity, it's construed in favor of the insured, and ambiguity is a circumstance where there's more than one reasonable interpretation, all those things. You just disagree with his conclusion. I agree with all the points, but disagree seriously with the notion that section three is ambiguous because section three cuts and pastes wording from section one into section three. Okay. Sorry, I took up your whole agenda. I don't think so. Thank you, Mr. O'Donnell. Thank you, Mr. Sloss. Thank you, ladies. Thank you for your briefs and argument, and we'll take the matter under advisement, and we stand in recess.